# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| SOURCE ASSOCIATES, INC., et al., | ) | CASE NO. 5:15-cv-215 |
| | ) | |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| MITSUI CHEMICALS AMERICA, INC., | ) | **AND ORDER** |
| et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is the Rule 12(b)(6) motion to dismiss filed by defendant Gregory Bushman (in his individual capacity) and defendant Lewis Breon (Doc. No. 25 ["Motion"]). Plaintiffs filed a brief in opposition (Doc. No. 32 ["Opp'n"]) and defendants filed a reply (Doc. No. 33 ["Reply"]). For the reasons discussed below, the motion is granted in part and denied in part.

## I. BACKGROUND

On December 31, 2014, plaintiffs Source Associates, Inc. ("Source") and Conrad A. Mamajek, Inc. ("CAM") (collectively, "plaintiffs" or "Source/CAM") filed a complaint in the Summit County Court of Common Pleas against defendants Mitsui Chemicals America, Inc. ("Mitsui"), Gregory T. Bushman ("Bushman"), and Lewis Breon ("Breon") (collectively, "defendants"). On February 2, 2015, Mitsui filed its notice of removal based on diversity of citizenship. (Doc. No. 1.) Bushman and Breon timely filed a motion to dismiss for failure to state a claim. (Doc. No. 7.) This motion was dismissed without prejudice after plaintiffs were granted leave to amend the complaint.

In the first amended complaint (Doc. No. 23 ["FAC"]), plaintiffs added a fourth defendant, NXT Phase, LLC ("NXT"),[1] and set forth sixth claims for relief: against Mitsui only for breach of contract (claim one) and for breach of the covenant of good faith and fair dealing (claim two); against Bushman, Breon and NXT for tortious interference with the contractual and business relationship between Mitsui and Source/CAM (claim three); against all four defendants for tortious interference with contractual and business relationships between Source/CAM and Brindle and between Source/CAM and Complex (claim four), for unjust enrichment (claim five), and for civil conspiracy (claim six).

The factual allegations underlying all six claims are as follows. In the Spring of 1999, Source and CAM entered into a joint venture for the purpose of selling off-spec Mitsui polymer to the petroleum compounder market. In particular, they sold Viscosity Modifier Polymer ("VME") to two customers: John Brindle Oil and Chem LTD ("Brindle") and Complex Chemicals Co., Inc. ("Complex"). The Source/CAM joint venture was allegedly extraordinarily successful and profitable. (FAC ¶ 7.) Under the joint venture, Source was responsible for paying all Mitsui invoice costs associated with the purchase of product, and for preparing and sending all invoices for the sale of the product. CAM was responsible for all aspects of sales, marketing and technical support, providing Mitsui with market information and negotiating supply, product and pricing with Mitsui. Net profits of the joint venture were divided equally between Source and Cam. (*Id.* ¶ 8.)

Plaintiffs allege that they spent considerable time, effort and resources identifying customers and their needs in the market, developing pricing policies, and nurturing and servicing

---

[1] The record does not reflect that NXT has ever been served with process. Although Bushman, who is NXT's statutory agent, has been served in his own capacity, that would not suffice as service on NXT, a separate entity.

relationships with Brindle and Complex. This information was confidential and proprietary to Source/CAM and had substantial economic value to them. (*Id.* ¶ 9.) In contrast, defendants spent no time, effort or resources doing the same. (*Id.* ¶ 10.)

Source/CAM had a long-standing contractual and business relationship with Mitsui. From 1999 through October 2013, Source regularly purchased off-spec polymer from Mitsui at prices it and/or CAM negotiated with Mitsui for sale to Brindle and Complex, and Mitsui drop-shipped its product to Brindle and Complex at addresses supplied by Source and/or CAM. (*Id.* ¶ 11.) At no time did Mitsui reserve the right to put to its own use the information supplied by Source and/or CAM, and at no time did Source and/or CAM have reason to believe that Mitsui or any of its employees would use the information supplied for any reason other than filling the orders of plaintiffs' customers. (*Id.*)

Bushman was an employee of Mitsui until his retirement on December 31, 2013. He held the position of Director of Business Development and, among his responsibilities, he dealt with Source/CAM for over fourteen (14) years. Plaintiffs believe that, as an employee of Mitsui, Bushman would have been bound by policies prohibiting his use of customer information supplied by Source/CAM. (*Id.* ¶ 12.)

Plaintiffs allege that, over time, Bushman "came into possession of secret and proprietary customer identification, buying history and pricing policies utilized by Source and CAM." (*Id.* ¶ 13.) "Thereafter, Bushman, in concert with Mitsui, Breon, and NXT, entered into a scheme to deprive Source and CAM of its valuable customer base, business line and stream of profit." (*Id.*) Each of them furthered the scheme and financially benefited from it. (*Id.*)

On June 13, 2013, allegedly around the same time NXT was formed, Bushman advised Source and CAM that he was retiring from Mitsui at the end of the year and that this

would have an impact on the off-spec business. He informed plaintiffs that Mitsui had decided that the last deliveries through Source/CAM would be in December 2013. (*Id.* ¶ 14.) Mitsui sent notices of termination of distribution of off-spec VME to the principals of Source and CAM on October 23, 2013. (*Id.* ¶ 15.) Thereafter, Mitsui allegedly breached its obligations to Source and CAM by allowing Bushman to use Source/CAM's information for his own purposes, while refusing to provide any further off-spec VME to Source/CAM. (*Id.* ¶ 16.)

After Bushman's retirement, Mitsui allegedly diverted all of Source/CAM's off-spec Mitsui market to Bushman, Breon, and NXT, thereby depriving Source/CAM of their customers, business line and stream of profit. (*Id.*)

## II. DISCUSSION

### A.    Standard on a Motion to Dismiss

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). Although this pleading standard does not require great detail, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citing authorities). In other words, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id*. at 556, n. 3 (criticizing the *Twombly* dissent's assertion that the pleading standard of Rule 8 "does not require, or even invite, the pleading of facts").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more

than conclusions." *Id*. at 678-79. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679. "The court need not, however, accept unwarranted factual inferences." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).

**B.      Analysis**

   *1.      Claims Three and Four – Tortious Interference*

In Ohio, to establish a claim of tortious interference with a contract, a plaintiff must show: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999) (citing *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863 (Ohio 1995) Syllabus ¶ 2). The elements are the same for establishing tortious interference with a business relationship. *First-Knox Nat'l Bank v. MSD Props., Ltd.*, No. 15CA6, 2015 WL 6739547, at *3 (Ohio Ct. App. Nov. 3, 2015) (citation omitted).

   *a.      Claim Three*

In their third claim for relief, plaintiffs allege that Bushman, a Mitsui employee (Director of Business Development) with a fourteen-year access to plaintiffs' secret and proprietary customer information, advised plaintiffs, at about the same time that he and Breon, a Lubrizol employee, formed NXT, that he would be retiring from Mitsui in a few months and that "this will have an impact on the off-spec business" and that "the current business route through

5

[Source/CAM] will not be continued." (FAC ¶¶ 12-14.) Bushman advised that Mitsui's product deliveries to plaintiffs would end in December 2013. (*Id.* ¶ 14.)[2] The complaint further alleges that Bushman also informed Lubrizol, Breon's employer, that he and Breon would be handling the off-spec polymer business of Mitsui after Bushman's retirement, and that Mitsui (induced by Bushman, Breon, and NXT) did in fact divert the off-spec polymer market to Bushman, Breon and NXT, thereby depriving plaintiffs of their customer base, their business line, and their stream of profit. (*Id.* ¶¶ 17, 32-33.) Plaintiffs allege that this action by Bushman, Breon and NXT amounts to tortious interference with their business and contractual relationship with Mitsui.

Defendants argue that claim three fails to state a claim for relief because Bushman was an agent of Mitsui at the time of his alleged actions and, therefore, was privileged to advise plaintiffs that Mitsui would no longer be supplying them with product after 2013. (Reply at 277.) They further argue that no contact is even alleged between Breon and Mitsui (Motion at 212), and that no act is alleged on the part of Breon that tortiously interfered with Mitsui's business relationship with plaintiffs (Reply at 278).

In opposition, plaintiffs first recite the elements of tortious interference, and then recite the allegations of the FAC. (Opp'n at 266.) They then declare that the complaint pleads a business relationship with Mitsui, which was known to Bushman and Breon, and "that the parties intentionally interfered with and caused the relationship[] not to continue." (*Id.*) They further argue that Bushman was not privileged as a Mitsui employee or agent to act as he did because it is "entirely plausible ... that [he] was acting outside the scope of his employment[,]" and, after his retirement, his tortious conduct "continued each and every time he sold the polymer to Plaintiffs' former clients." (*Id.* at 268.) They argue that Bushman "created [NXT] while still

---

[2] Paragraphs 1 through 30 of the FAC are incorporated into the third claim. (FAC ¶ 31.)

employed by Mitsui and then utilized this newly formed company to breach existing contracts and to tortuously [sic] interfere with existing business relationships and arrangements and future business relationships and arrangements." (*Id.*)

Although Bushman's actions (i.e., his "interference") might have been privileged by virtue of his position with Mitsui, if he instead acted outside the scope of his duties and in furtherance of his own interests, he may be personally liable for tortious interference. *See, e.g.*, *Scanlon v. Gordon F. Stofer & Bros., Co.*, Nos. 55467/55472, 1989 WL 69400, at * 10 (Ohio Ct. App. June 22, 1989) ("a corporate … employee of a contracting party, *while acting within the scope of his position or employment*, is immune from suit for a claim of tortious interference with a contract") (emphasis added) (citations omitted).) Plaintiffs have alleged their belief that, as a Mitsui employee, Bushman would have been prohibited from using plaintiffs' customer information to his own advantage. (FAC ¶ 12.) Although plaintiffs also allege that they need discovery to bear this out, it is not implausible, within the meaning of *Trombly* and *Iqbal*, that plaintiffs' allegation will prove true and that, for his own post-retirement financial gain, Bushman tortiously interfered with plaintiffs' relationship with Mitsui. This Court is required to accept plaintiffs' factual allegations as true and apply every reasonable inference in their favor. Therefore, the third claim survives as to Bushman.

As to Breon, however, the third claim fails. Plaintiffs have failed to allege that he took any actions, tortious or otherwise, to interfere with their relationship with Mitsui. At best, they allege some sort of "guilt by association" with Bushman; but that is insufficient. Therefore, defendants' motion is granted to the extent it seeks dismissal of the third claim for relief against Breon.

### b.    *Claim Four*

In their fourth claim, plaintiffs allege that Bushman, Breon, NXT, and Mitsui, together and without privilege, "induced or encouraged Brindle and Complex[] not to continue the contractual arrangement and business relationship by and between Brindle, Complex, Source and CAM[,]" "destroyed [their] business arrangement and agreement[,]" and "entered into and implemented a scheme to deprive Source and CAM of its valuable customer base, business line and stream of profit with Brindle and Complex." (FAC ¶¶ 36-38.) This alleged "misconduct interfered with and extinguished the advantage and the expectancies Source and CAM had associated with the contractual arrangement and business relationship between Brindle, Complex and themselves." (*Id.* ¶ 39.)

Defendants Bushman and Breon argue that no tortious conduct on their part influenced Brindle and/or Complex to discontinue their relationships with plaintiffs. Rather, defendants assert that plaintiffs lost their business with Brindle and Complex solely because they lost Mitsui as a supplier and, therefore, had no product to sell. Defendants argue that it was not misconduct for them to compete with Source/CAM by selling to Brindle and Complex. (Motion at 212-13.) In their reply, they further point out that any alleged tortious conduct directed toward *plaintiffs* does not support a claim of tortious interference with plaintiffs' relationships with its two customers. (Reply at 278.)

Plaintiffs do not address claim four separately from claim three, and their claim three arguments primarily address only Bushman's alleged actions. Nor do plaintiffs oppose defendants' arguments that, under Restatement (Second) of Torts § 766 cmt. m and § 768, legitimate competitive action by defendants is not tortious, no matter how damaging it may be to plaintiffs. (Motion at 213.) Notably, plaintiffs also fail to allege any factual support for their

8

assertion in FAC ¶ 36 that they had a "contractual arrangement" with Brindle and Complex, and, moreover, that such contractual arrangement was not terminable at will.

Applying the pleading standards of *Twombly* and *Iqbal* and the elements of tortious interference, the Court concludes that claim four fails to state a claim against Bushman and/or Breon and, to that extent, defendants' motion to dismiss claim four is granted.

### 2. *Claim Five – Unjust Enrichment*

To set forth a claim of unjust enrichment, a quasi-contractual claim, plaintiffs must allege the following elements: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment ('unjust enrichment')." *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984) (citation omitted).

In their fifth claim, plaintiffs allege that defendants Bushman, Breon, and Mitsui, without spending "any time, effort or resources" of their own, benefited from their use of Source/CAM's "considerable time, effort and resources in identifying customers and their needs in the market, developing pricing policies and in nurturing the relationship with and servicing Brindle and Complex." (FAC ¶¶ 9-10.)[3] The complaint further alleges that "[t]hrough their misuse of Source's and CAM's information for their own benefit and other misconduct, Defendants have deprived Source and CAM of its valuable customer base, business line and stream of profit with Brindle and Complex and divided upon [sic] the advantages derived therefrom among themselves." (*Id.* ¶ 44.) Plaintiffs seek an accounting and disgorgement of the benefits realized by the defendants. (*Id.* ¶ 47.)

---

[3] Paragraphs 1 through 41 of the FAC are incorporated into the fifth claim. (FAC ¶ 42.)

Bushman and Breon argue that the complaint fails to allege any contractual or business relationship between plaintiffs and Bushman and/or Breon sufficient to support a quasi-contractual claim. They further assert that "[t]here is no unjust enrichment claim based on tortious interference with contract." (Motion at 214.)

The Court need not address the argument that there is no allegation of a contractual relationship because that is not an element of the claim of unjust enrichment. In fact, that is the whole point of a claim of quasi-contract, which "is not a true contract, but instead a liability imposed by courts in order to prevent unjust enrichment." *Reisenfeld & Co. v. Network Grp., Inc.*, 277 F.3d 856, 860 (6th Cir. 2002) (citation omitted).

In arguing that there is no unjust enrichment claim based upon tortious interference, defendants cite *Developers Three v. Nationwide Ins. Co.*, 582 N.E.2d 1130, 1135-36 (Ohio Ct. App. 1990). But that case was addressing the correct measure of damages for tortious interference, and held that such damages cannot be recovered under an unjust enrichment theory. In other words, damages for tortious interference could not be based on defendant's gain, but only on plaintiff's loss. *Developers Three* is not helpful and defendants make no other argument. Although they assert that plaintiffs do not allege any benefit conferred upon Bushman and/or Breon, the Court disagrees. The complaint alleges that defendants enjoyed the benefit of Source/CAM's customer development and all that that entailed. Plaintiffs essentially allege that they did all the leg work and defendants walked away with the benefits, including the business of Source/CAM's two customers, Brindle and Complex.

Although a close call, the Court cannot conclude that the fifth claim fails to state a claim against Bushman and/or Breon. To that extent, defendants' motion is denied.

### 3.     Claim Six – Civil Conspiracy

Civil conspiracy "has been defined as a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *LeFort v. Century 21-Maitland Realty Co.*, 512 N.E.2d 640, 645 (Ohio 1987) (citation omitted). "[A]n underlying unlawful act is required before a civil conspiracy claim can be successful." *Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996) (citations omitted). Further, "[t]he civil conspiracy claim must be pled with some degree of specificity, and vague or conclusory allegations that are unsupported by material facts will not be sufficient to state a claim." *Avery v. Rossford, Ohio Transp. Improvement Dist.*, 762 N.E.2d 388, 395 (Ohio Ct. App. 2001) (citations omitted). "Although detail is unnecessary, the plaintiffs must plead the facts constituting the conspiracy, its object, and accomplishment." *Schell v. Kaiser-Frazer Sales Corp.*, 274 N.E.2d 315, 318 (Ohio Ct. App. 1971).

In their sixth claim, plaintiffs allege that "Bushman, in concert with Mitsui, Breon, and NXT, entered into a scheme to deprive Source and CAM of its valuable customer base, business line and stream of profit." (FAC ¶ 13.)[4] Further, they allege that "Bushman and Breon [the movants] aided and encouraged the other Defendants, and acted in concert with them, to deprive Source and CAM of their valuable customer base, business line and stream of profit." (*Id.* ¶ 51.) Finally, they allege that "NXT was used as one of the vehicles" to accomplish this goal. (*Id.*)

Defendants first argue that claim six fails due to the intra-corporate conspiracy doctrine, under which a corporation (here, Mitsui) cannot conspire with its own employee (here, Bushman). (Motion at 215.) They argue that there are no allegations made against Bushman

---

[4] Paragraphs 1 through 47 of the FAC are incorporated into the sixth claim. (FAC ¶ 48.)

other than allegations relating to his actions as an employee of Mitsui. Defendants next argue that the allegations of the complaint lack the requisite specificity. They assert that, at best, the complaint alleges that Mitsui, *through* its agent (Bushman), terminated its at-will business relationship with plaintiffs or breached a contract with them, neither of which are torts. They argue that claim six contains no more than unsupported legal conclusions.

Plaintiffs argue in opposition that the intra-corporate conspiracy doctrine does not apply because of their allegations that Bushman acted outside the scope of his employment. They fail to address defendants' arguments that the allegations are insufficiently specific and do not allege an underlying tort.

While again a close call, applying the appropriate standards and the minimum pleading requirements of *Schell*, *supra*, the Court concludes that the allegation that Bushman acted outside the scope of his employment with Mitsui (FAC ¶ 12), together with the allegations that the defendants, including the two movants, "entered into a scheme" (*id.* ¶ 13 – i.e., "the conspiracy" under *Schell*) "to deprive Source and CAM of their customers, business line and stream of profit" (*id.* ¶ 18 – i.e., "its object" under *Schell*), and that "Mitsui diverted … all of Source and CAM's off-spec Mitsui market to Bushman, Breon, [and] NXT[,]" (*id.* ¶ 17 – i.e., the "accomplishment" under *Schell*) is sufficient to meet the pleading requirements.

Accordingly, to the extent defendants' motion to dismiss seeks dismissal of the sixth claim, it is denied.

### 4. *Ohio's Uniform Trade Secret Act*

Defendants' final argument is that plaintiffs' claims, to the extent they allege misappropriation of confidential, proprietary information, are preempted by Ohio's Uniform Trade Secret Act ("OUTSA"). Ohio Rev. Code § 1333.61, *et seq*.

12

Relying on *Office Depot, Inc. v. Impact Office Prods., LLC*, 821 F. Supp. 2d 912 (N.D. Ohio 2011), plaintiffs argue that the claims attacked by Bushman and Breon survive preemption "because they allege factual matter beyond Defendants' alleged misappropriation arguments[,]" and that "any alleged misappropriation is but one aspect of the common law claims asserted[.]" (Opp'n at 273.)

In *Office Depot*, another branch of this court, confronted with claims of misappropriation of trade secrets, tortious interference, unjust enrichment, and various forms of breach of duty, analyzed Ohio Rev. Code § 1333.67(A), which "expressly preempts 'conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret.'" *Office Depot*, 821 F. Supp. 2d at 918. The court examined the construction of similar statutory provisions by courts of other jurisdictions and noted that the "dominant interpretation is that the preemption provision displaces any antecedent misappropriation-of-trade-secret claim and, further, any claim regarding 'theft or misuse of confidential proprietary, or otherwise secret information falling short of trade secret (e.g., idea misappropriation, information piracy, theft of commercial information, etc.).'" *Id.* at 918-19 (quoting *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*, 649 F. Supp. 2d 702, 720 (N.D. Ohio 2009)). Although noting that "[t]he Ohio Supreme Court has yet to speak to the scope of the OUTSA's preemption clause[,]" the court concluded that, since intermediate appellate courts in Ohio "have applied the majority view[,]" the Ohio Supreme Court would probably do the same. *Id.* at 919.

The court in *Office Depot* further examined the more difficult question of "whether the [statute] displaces common-law claims whose factual allegations may touch upon misappropriation-of-trade-secret facts but are intended to address another legal harm." *Id.* at 919

13

(citation omitted). "[O]ther courts confronted with this type of hybrid claim have upheld the portion of the common-law claim supported by an independent basis and dismissed the rest of the claim based on misappropriation-of-trade secrets." *Id.* at 920 (citing cases). The court adopted "this partial preemption approach[,]" concluding that it "allows a court to parcel out the common law theory designed to remedy a separate wrong from misappropriation of trade secrets." *Id.* at 921. Applying this approach, the court dismissed plaintiff's claim of misappropriation of trade secrets (finding it preempted), but retained portions of the two claims of tortious interference, the unjust enrichment claim, and the breach of duty claim, to the extent all these claims derived from an independent factual basis separate from the OUTSA claims.

Although this Court finds correct the standard for hybrid claims adopted in *Office Depot*, plaintiffs' complaint cannot be clearly construed to either contain, or *not* contain, an independent factual basis (beyond the alleged misappropriation of customer information and the like) for the various common law claims. In that respect, the Court finds persuasive the case of *Exal Corp. v. Roeslein & Assoc., Inc.*, No. 4:12-cv-1830, 2012 WL 4754748 (N.D. Ohio Oct. 2, 2012). Therein, yet another branch of this court found "persuasive the opinions [of those courts] that require fuller factual development prior to ruling on [OUTSA] preemption[,]" *id.* at *3, and, on that basis, denied as premature a motion to dismiss based on preemption. The court directed that the issue could be revisited, if appropriate, on summary judgment. This strategy is appropriate in the instant case as well.

Accordingly, the Court will not resolve the question of OUTSA preemption at this juncture. On that basis, defendants' motion to dismiss is denied.

14

### III. CONCLUSION

Given the standard the Court is required to apply, the motion to dismiss of defendants Bushman and Breon (Doc. No. 25) is granted in part and denied in part. Dismissal of the third claim is granted as to defendant Breon; dismissal of the fourth claim is granted as to defendants Bushman and Breon. Dismissal of claim five and claim six as to both Bushman and Breon is denied. Finally, dismissal of any of the remaining claims on the basis of OUTSA preemption is denied.

**IT IS SO ORDERED**.

Dated: March 3, 2016

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

15